TWEEDIE TRADING CO. v. WESTERN ASSUR. CO. OF TORONTO.

SAME v. HIGGINS et al.

(District Court, S. D. New York. March 27, 1909.)

INSURANCE (§§ 159, 415, 489*) — MARINE INSURANCE — SHIPMENT OF CATTLE —INSURANCE SUBJECT OF BILL OF LADING—DEVIATION OF ROUTE—"UNSEAWORTHY."

Insurance on freight on cattle shipped from New Orleans to Cape Town, South Africa. Loss en route by mortality said to have been due to improper food furnished by the shippers. It appeared that the food supplied was ample in quantity, and of a quality the animals were accustomed to on the ranges from which they were taken. It was approved by competent experts in New Orleans. Held that as the insurance was against mortality generally, the underwriters were liable notwithstanding the unusual number of deaths, due, perhaps, to a deficiency in kinds of fodder supplied. Vessel not unseaworthy for such reason. Bill of lading freight the subject of insurance and held recoverable. A deviation en

route to Barbados *held* justified by a mutiny among the cattle men and the expenses thereof recoverable from the underwriters.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1111, 1255; Dec. Dig. §§ 159, 415, 489.\*

For other definitions, see Words and Phrases, vol. 8, p. 7210.]

(Syllabus by the Judge.)

Ralph J. M. Bullowa, for libellant.
Wing, Putnam & Burlingham, for respondents.

ADAMS, District Judge. These actions were brought by the Tweedie Trading Company to recover from the Western Assurance Company and A. Foster Higgins et al. certain insurance, said to be due by reason of the loss of freight caused by the death of a number of cattle shipped on the steamship Nordkyn, of which the libellant was the chartered owner, for transportation from New Orleans to Cape Town, South Africa.

The amended libel alleges that on the 8th day of July, 1904, the libellant sub-chartered the said steamer to James Graham of New Orleans for a period of one trip from New Orleans to Cape Town, to transport a cargo of live stock and general merchandise and that the steamer should discharge there as customary; that the total amount of freight payable by the said Graham was to be a lump sum of £4,-250 and one-half thereof, or £2,125, was prepaid by the said Graham at New Orleans; that it was further agreed in said sub-charter that the balance of the bill of lading freight should be insured at the charterer's expense, for the ship's benefit, against all risks, including mortality; that after the making of the said sub-charter, and before the 5th of August, 1904, the Western Assurance Company, in consideration of a certain sum to be paid to it by said Graham, underwrote its two policies of insurance in the said balance of freight money to become due under the sub-charter, one policy for the sum of £708.11.6 and delivered it to Graham, whereby it insured Graham and his assigns to the extent of the said sum, for the benefit of the libellant, against all risks which might happen to the cattle upon the voyage, including mortality, and another policy for the sum of £455.3.2 which was delivered to Dale & Company, whereby they and their assigns were insured to that extent for the benefit of the libellant against all risks that might happen to the cattle, including mortality; that Graham shipped a cargo on the steamer of about 5,000 head of cattle; that on the 5th of August, 1904, the vessel sailed from New Orleans for Cape Town and arrived at the latter place on or about September 21, 1904; that during the voyage 768 out of the 4,735 head of cattle died from causes incident to the voyage, and from natural causes, which risk was one of the perils insured against, and the consignees of the cargo, on account of said deaths, deducted from the amount of freight money which was payable under the bills of lading, the sum of £697.8.6 and the said sum, being parcel of the balance of said freight money insured by the said policies, remains and is wholly unpaid to the libellant; that before the arrival of the vessel at Cape Town the said Graham and Dale & Co. assigned to the

libellant the policies for a valuable consideration pursuant to an agreement contained in the said sub-charter; that the respondent was duly notified of the loss of the freight money, and due proof made thereof, and that the libellant during January, 1905, demanded payment of the balance upon the policies, which it refused to pay, whereby it became indebted to the libellant in the sum of $1,861.92 with interest. For a second cause of action, after referring to some of the foregoing allegations, it was stated that on or about August 19, 1904, 10 of the men shipped by the owners of the cargo for the care of the cattle, without good cause or justification, refused to do the work required of them and mutinied and the steamer could not with safety proceed without obtaining other men in place thereof, and part of the water supply became stagnant and thereupon in order to protect and safeguard the cargo, the master of the Nordkyn deviated and proceeded to Barbados as a port of refuge, where other men were secured and fresh water, pursuant to the direction of the respondent and its agents, was supplied; that by reason of the said deviation and under the provisions of the policies, the libellant is entitled to recover from the respondent the cost of said deviation, amounting to $2,915.19.

The respondent duly answered the libel and admitted, inter alia, that on August 5th, 1904, at New Orleans, and at August 13th, 1904, at Montreal, it issued certificates whereby it insured the persons named in the certificates on the balance of the freight money to become due under the sub-charters mentioned in the libel; that there were shipped on the Nordkyn in New Orleans in August, 1904, 4,050 sheep, 93 horses, 412 mules and 280 donkeys or thereabouts; that on or about August 5th, 1904, the steamer sailed from New Orleans; that after making a deviation to Barbados, she arrived in Cape Town on or about September 21st, 1904; that during the deviation, or after her arrival in Cape Town, 768 of said animals, to wit, 332 sheep, 81 horses, 183 mules and 172 donkeys died. The respondent then denied any knowledge or belief as to whether bills of lading were issued for the animals and as to whether the consignees under the bills of lading deducted £697.8.8 or any other sum from the freight money payable thereunder. The respondent then makes some further formal admissions and denials and, further answering, alleges that the Nordkyn was unseaworthy in the following respects, among others, viz: improper food, unsuitable and improper hay, insufficiency of bran, oats and grain, insufficiency of proper attendants, want of proper veterinary surgeon, insufficient ventilation.

The libel against A. Foster Higgins et al. alleged that they were the attorneys for the several subscribers at United States Lloyds and trustee to conduct an insurance business upon the Lloyds plan for the subscribers; that upon a proper consideration they underwrote their policy of insurance on the said balance of freight money and became indebted to the libellant thereunder in the sum of £700. The remaining allegations are substantially the same as in the Western Assurance Company action and the answer of the respondents in this case corresponds with the answer there. And further answering the respondents here allege that the freight insured by them was a balance of a lump sum under the said sub-charter and there was no loss of freight

under the policy, and further answering they allege that the deviation of the Nordkyn was unjustifiable and inexcusable.

The contracts of insurance are practically admitted in the pleadings, and in addition thereto the policies and certificates of insurance were offered in evidence by the libellant and received, showing the contracts as claimed by the libellant. The assignments to the libellant were duly proved, also the issuance of bills of lading and certain deductions made from the freight moneys by reason of the loss of some of the cattle.

The principal contention on the facts is with respect to the seaworthiness of the Nordkyn as a live stock carrying vessel. It is urged by the underwriters that the mortality was due to the character of the fodder. And it is further urged that if the fodder furnished was unexceptionable in itself, the proofs established that hay alone was not a sufficient or proper food for the live stock shipped on this steamer; that it is essential to supplement the hay with bran and oats.

It appears that the Nordkyn was amply provided with hay but had only 12 sacks, 2,040 pounds, of bran and only 25 sacks, 4,490 pounds, of oats. The quality of the hay is in dispute but the preponderance of the testimony shows it was a proper kind for these animals, which were taken from the ranges, and used to similar hay. Timothy hay, which is sometimes supplied for animals in transit, was in some respects a better, as it was a more expensive, article, but it could hardly be expected that the latter would be supplied, inasmuch as the former was the kind the animals were accustomed to.

The quantity of bran and grain furnished was possibly inadequate. There is a great conflict of testimony as to the kind of a laxative to be used and whether it should be a food or a medicine. In the latter case, there was doubtless sufficient. Graham testified that he bought Texas hay because it was the natural food of the animals, which were from Texas. He said that in his negotiations with the parties in London, who ultimately proved to be the agents of the parties with whom he placed the insurance, they inquired whether the food that would be furnished during the voyage would be the same that the animals had been used to. He further said that the hay was inspected at New Orleans by Joseph R. Givins, a licensed inspector and public weigher, and Dr. L. M. Holmes, of the Ontario Veterinary College, who issued a certificate that he had examined the hay placed on the steamer and found it to be of "good sound quality and suitable in every way for the purposes described." He further certified that:

"A small quantity of oats and bran of good quality had been placed on board, and the necessary medical and surgical supplies, for use in special cases of sickness amongst the animals."

Both Mr. Givins and Dr. Holmes were examined by deposition. The former testified that he had had about 16 years' experience in inspecting hay and the hay shipped was "a fair to good quality of Texas prairie hay, suitable for feeding Texas animals." He said on cross-examination that his knowledge was based on what people told him; that he had seen the Texas hay used for feeding cattle on ships before. Dr. Holmes testified as to his 8 years' experience as a veter-

inarian in New Orleans and said the hay referred to in his certificate was a good quality of prairie hay; that a great deal of it was used in New Orleans and he had had charge of a number of horses and stables that used it; that it was a "mighty good filler and a good nutritious food"; that if he were going to submit an animal to a strain which it was unused to for a considerable period of time, he would consider it best to give it a food to which it had been accustomed; that the vessel otherwise was properly furnished with medicines and surgical apparatus; that he examined the animals twice in New Orleans and they were all in good condition when they left; that they were ranch animals, excepting 4 cattle from up the country; that it was at his suggestion "that they did not send any bran and oats to amount to anything." He said when a mule or horse becomes constipated, he made some change in his food, gave him "a little bran and water mixed up and salt put in it"; that when an animal becomes constipated, the proper remedy would be to "change his food and give him bran mashes, if you can get him to eat it"; that the vessel did not have a veterinarian aboard but had a man named Gardner, who was "a good horseman. He was a man who was in the business and knew quite a bit about horses."

There was an unusual number of deaths among the cattle on the steamer. They commenced to die almost immediately after shipment, and the mortality continued day by day up to and for several days after her arrival at Cape Town. There were shipped 280 donkeys, 4,050 sheep, 412 mules and 93 horses. There were delivered a considerable number less, the loss by death having been 172 donkeys, 332 sheep, 183 mules and 81 horses. The voyage was rather a long one, several days in excess of the average, and the respondents' witnesses, among whom were some credible experts, while commenting on the risk incurred by the length of time the cattle were on board, 45 days, 5 of which were spent in Barbados, were not inclined to attribute the deaths to this cause but rather to insufficient nourishment in the food supplied, which was almost solely the hay hereinbefore described. The chief veterinarian for the Government at Cape Town, for example, said that the deaths and condition of the animals were due to defective nourishment in the hay supplied, which did not contain all the constituents necessary to form a complete food. He said there was an abundance of the hay, which had been well prepared and looked perfectly sound and if it contained the necessary constituents, they did not exist in a form capable of being properly digested and assimilated by the organs of the animals,

The respondents in their brief claim that a perfect defence exists by reason of the deficiency of the proper kind of food and cite in support of that contention the case of Sleigh v. Tyser, L. R. 2 Q. B. Div. 333, 5 Com. Cases, 271, where Mr. Justice Bigham held that insufficient ventilation and an insufficient supply of cattle men constituted a breach of the implied condition of seaworthiness. That was an action to recover the plaintiff's proportion of the amount payable in respect of a loss of cattle shipped at Brisbane on a steamer for carriage to Lourenço Marques in Delagoa Bay. The contract of insurance there

was somewhat similar to those involved here, and was expressed to cover:

" 'All risks of shipping, unloading craft, &c., until safely landed; all risks including mortality and jettison arising from any cause whatever; animals walking ashore or, when slung from the vessel, walking after being taken out of the slings and landed, to be deemed arrived, and no claim to attach to this policy on such animals. Each animal to be deemed a separate insurance. Fittings and condition of cattle to be approved by Lloyd's agent's surveyor.' " 2 Q. B. 333.

I think, however, that this question is not governed by that decision. There was no warranty of seaworthiness here with respect to food as there was there with respect to fittings and men. Deficiency in either fittings or men would constitute unseaworthiness of the vessel, but I do not think that the failure to furnish exactly the proper kind of food for cattle cargo can be held to do so or to exclude a recovery. The provisions for insurance in these contracts were:

"Be it known that H. B. Sedgwick & Co. * * * cause * * * to be insured, lost or not lost, at and from New Orleans to Cape Town * * *; and it shall be lawful for the said ship, &c., in this Voyage to proceed and sail to and touch and stay at any Ports or Places whatsoever or wheresoever without Prejudice to this Insurance. The said Ship, &c., Goods and Merchandises, &c., for so much as concerns the Assured by Agreement between the Assured and Assurers in this Policy, are and shall be valued at
On Ocean Freight on 4,050 Head of Sheep @ 4/8¼ each....... = £949. 4.4
                             100  "   "  Mules @ £2.14/- each..... = 270. 0.0
                              91  "   "  Mares @ £1.17.6 each..... = 170.12.6
                             312  "   "  Mules @ £1.17.6 each..... = 585. 0.0
                             280  "   "  Donkeys @ 10/9 each..... = 150.10.0
Including risk of mortality, jettison and washing overboard. Animals walking ashore or when slung from the vessel walking after being taken out of the slings to be deemed a safe arrival and no claim except General Average to attach thereto."

The obvious distinction between the underwriters' obligations here and in Sleigh v. Tyser is that in the latter there was an unseaworthiness in the ordinary sense, that is the vessel was deficient in equipment, and in the case at bar, if there was any deficiency it was in the kind of food provided for the animals. The shippers of the animals seem to have taken every reasonable precaution, under the best obtainable advice, to make proper provision for their welfare. It is possible that the arrangements made were not such as would be adopted after the experience that was obtained from this voyage but if that is so, it does not seem that the underwriters should be relieved from their liability to be responsible according to their agreement. One of the risks they took was that of mortality, and this risk caused a very heavy and unusual loss but in the absence of unseaworthiness, which would prevent the policies from attaching, I do not see why they should not respond. It is argued by the respondents that the vessel was unseaworthy because proper fodder was not furnished and the said authority is cited to support the proposition but I do not think it can properly be deemed to go to that extent. Every proper effort was made here to render the ship in a suitable condition with respect to fodder and if the unusual loss was due to the hay, or rather lack of additions to the hay for the purpose of rendering it more digestible

and nutritious, that was knowledge obtained after the event and should not affect the obligations of the underwriters, who took the risk at premiums with which they were satisfied at the time. I do not know what the value of insurance would be if it could be set aside in a case of this kind. I therefore hold that the obligations of the insured with respect to furnishing food for the animals were complied with and the defence in this respect should fail.

The respondents claim that the libellant suffered no loss under the policies.

It appears that the libellant was the time-charterer of the Nordkyn and on July 8th, 1904, sub-chartered her to James Graham "for a period of one trip from New Orleans to Cape Town, S. A. with a cargo of live stock and general merchandise etc." The charter further provided:

"4. Also that the total amount of freight payable by the parties of the second part is to be a lump sum of £4,250 Br. Stg. in full of all primage, port charges, dues, pilotages, etc. at both ports of loading and discharging. One half of this total amount of freight say £2,125 Br. Stg. to be prepaid by the parties of the second part at New Orleans, on signing Bills of Lading by the Master. The remaining one half, say, £2,125 Br. Stg. to be paid on delivery of the live stock etc. at Cape Town, S. A. Bills of Lading to give ship lien on live stock etc. for the balance of freight due, this balance to be insured at charterers expense for ships benefit against all risks including mortality. Insurance certificate to be turned over to The Tweedie Trading Co. as soon as received by Jas. Graham and Jas. Graham to notify the Tweedie Trading Co. before sailing of where insurance effected and conditions. * * *

7. Also that, the captain shall sign Bills of Lading as and when presented without reference or prejudice to this charter party, any difference in freight to be settled at port of loading before sailing, if in charterers favor, by Captain's draft payable five days after arrival at Cape Town, if in steamers favor, in cash at New Orleans less the insurance. * * *

9. Also that, charterers to supply live stock fittings, furnish cattlemen, feed and fodder for the live stock at their own expense and to load and discharge the ship free of charge.

10. Also that, the ship is to pay for victualing the cattlemen, furnishing them with ordinary cattlemen's food and returning them to a United States Port via port or ports."

It was alleged in the first libel that the Western Assurance Company:

"* * * underwrote its policy of insurance on the said balance of freight money to become due under the said sub-charter,—that is to say,—the sum of Two thousand one hundred and twenty-five pounds British sterling, and delivered the said policy of insurance to the said Graham. wherein and whereby it insured the said Graham and his assigns, to the extent of said balance, for the benefit of libelant, against all risks that might happen to the said cattle upon the said voyage, including mortality. * * *"

The libel also alleged:

"It was further agreed in said sub-charter that the balance of the charter hire should be insured at the charterer's expense. * * *"

The first amended libel alleged:

"Said charter provided that the libelant should have a lien on freights and subfreights for the payment of charter hire."

The libellant filed a second amended libel in which it alleged that the respondents:

"* * * underwrote its two certain policies of insurance on the said balance of the freight money to become due under the said sub-charter. * * *"

On the trial, the libellant moved to amend its second amended libel by inserting the words "bill of lading" before the word "freight." This was subsequently allowed. Consequently the subject of insurance was the bill of lading freight.

The respondents claim that the libellant has no interest in such freight and therefore none in the subject insured; and further that the freight had actually been earned and it follows that the underwriters can not be held liable.

It appears that section 4 of the charter provided as quoted above.

The balance of freight due was the subject of insurance. It might have been one-half of £4,250 or might have been more. It was in fact £2,125.6.10, with a detailed valuation on each animal. Apart, however, from such nice computations, there was an evident intention here that the libellant should be insured against any loss of freight which it might suffer and it seems obvious that a loss was suffered by it. This claim of the respondents should therefore be rejected.

The further contention is made by the respondents that there is no legal or other justification for the allowance of alleged expenses in Barbados.

There was no real trouble about the water for although one tank had become stagnant, there was an abundance in the remaining tanks and if there had been any deficiency it could have been supplied by means of the condenser on board. There was no reason therefore for going to Barbados on account of water, although some was put aboard there. There was difficulty, however, about the cattle men. Some 10 of them became dissatisfied, alleging insufficiency of the proper kind of food. The demand was not justified as there was ample food, which they were obliged to admit. They then asked for fresh bread. This it was impossible to furnish them. They were getting the same kind of bread as the other men but they remained dissatisfied and refused to work. It was concluded that the cattle were in danger, and it was necessary to seek the nearest port, which was Barbados, to obtain new men.

The provisions of the contracts upon this point were:

"* * * And in case of any loss or misfortune, it shall be lawful and necessary to and for the assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defence, safeguard and recovery of the said Live Stock, or any part thereof, without prejudice to this insurance; to the charges whereof, the said Assurers will contribute according to the rate and quality of the sum herein insured. * * *"

It was held in The Pomeranian, Prob. Div. 1895, 349, that a marine policy of insurance on live cattle, including mortality from any cause whatsoever, renders the insurer liable, under the suing and laboring clause, for the extra cost of fodder supplied to the cattle whilst the vessel in which they were shipped was detained in a port of refuge for necessary repairs due to perils of the sea, for there was a danger of total loss unless the expense was incurred. The facts there are somewhat different from those in the case under consideration, but there does not appear to be any difference in the governing principle.

Here there was also danger of loss if the deviation was not made, and it seems proper that the underwriters should bear the expense. See, also, Popham v. The St.·Petersburg Ins. Co., 10 Com. Cas., 276.

The underwriters were duly kept advised of the Barbados incident by the libellant and approved of its action, subject of course to the subsequent determination of their legal liability. What was done was for the underwriters' benefit and they should respond for the disbursements.

There will be a decree for the libellant for the freight on the lost animals, also to·cover the Barbados expenses, for the ascertainment of which a reference will be necessary.